# In the United States Court of Federal Claims

No. 17-421
Filed: December 27, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | ✳ 26 U.S.C. § 6511 (Limitations On Credit |
| | ✳   Or Refund); |
| | ✳ 26 U.S.C. § 6672 (Failure To Collect And |
| | ✳   Pay Over Tax); |
| | ✳ 26 U.S.C. § 7121 (Closing Agreements); |
| | ✳ 26 U.S.C. § 7422 (Civil Actions For |
| | ✳   Refund); |
| ALICE KIMBLE, | ✳ 28 U.S.C. § 1346 (United States As |
| | ✳   Defendant); |
| Plaintiff, | ✳ 28 U.S.C. § 1491 (Tucker Act); |
| | ✳ 31 U.S.C. § 5314 (Records And Reports |
| v. | ✳   On Foreign Financial Agency |
| | ✳   Transactions); |
| THE UNITED STATES, | ✳ 31 U.S.C. § 5321 (Civil Penalties); |
| | ✳ 26 C.F.R. § 301.7701(b)-2(d)(1) (Closer |
| Defendant. | ✳   Connection Exception); |
| | ✳ 31 C.F.R. § 1010.350 (Reports Of Foreign |
| | ✳   Financial Accounts); |
| | ✳ 31 C.F.R. § 1010.820 (Civil Penalty); |
| | ✳ RCFC 11(b) (Representations To The |
| | ✳   Court); |
| | ✳ RCFC 56 (Summary Judgment). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**James O. Druker**, Kase & Druker, Garden City, New York, Counsel for Plaintiff.

**Jason S. Selmont**, United States Department of Justice, Tax Division, Washington, D.C., Counsel for the Government.

### MEMORANDUM OPINION AND FINAL ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**BRADEN**, *Senior Judge*.

This case presents two issues arising under 31 U.S.C. § 5321(a)(5) (2004) that currently are before the United States Court of Appeals for the Federal Circuit in a pending appeal: (1) whether the Internal Revenue Service ("IRS") must establish that a taxpayer had knowledge of the legal duty under federal tax law to report foreign bank accounts, but acted in "reckless disregard" of that duty, before it may impose a civil penalty for a willful violation of 31 U.S.C. § 5314; and (2) whether the maximum penalty for a willful violation of 31 U.S.C. § 5314, as set forth in 31

U.S.C. § 5321(a)(5)(C)(i) (2004), supersedes 31 C.F.R. § 1010.820(g)(2).  *See* Appellant's Br., *Norman v. United States*, Fed. Cir. No. 18-2408 (Nov. 20, 2018).

## I.   RELEVANT FACTUAL BACKGROUND.[1]

### A.   Alice Kimble's Foreign Bank Accounts.

Alice Green is a United States citizen, born in 1951.  Stip. ¶ 1.  Her father, Harold Green, died in 1997; her mother, Frances Green, died in 2016.  Stip. ¶ 10.

Sometime prior to 1980, Harold Green and Frances Green opened an investment account at the Union Bank of Switzerland ("UBS account"); Harold Green designated Alice as a joint owner.  Stip. ¶¶ 12, 13.

According to Harold Green's daughter, the purpose of the UBS account was, as follows:

> As you know, ever since you have been a little girl, I have taught you that we need to have a safe haven because I am Jewish.  You are half Jewish and our family was killed in the Holocaust and my parents escaped prosecution.  So we have an account that we are not going to use the money for in case we ever have to escape America and it's in Switzerland and you must never tell anybody about this account.

Alice Kimble Tr. 18:24–19:8.

Neither Harold nor Frances Green filed a gift tax return reporting that Alice Green was a co-owner.  Alice Kimble Tr. 18:1–13.

In 1983 or 1984, Alice Green married Michael Kimble.  *Compare* Stip. ¶ 7 *with* Michael Kimble Tr. 25:6.  Sometime afterwards, Harold Green told Michael Kimble about the UBS account.  Stip. ¶ 15; Michael Kimble Tr. 38:21–39:1 ("[Harold Green] feared . . . a repeat of the Holocaust.  And to the extent that anyone knew about this bank account that would defeat the whole purpose."); 41:13–16 ("You cannot touch this, except for dire emergency.  Life-and-death emergency. You need to get out of the country.").  Michael Kimble promised to "always respect" Harold Green's wishes.  Alice Kimble Tr. 22:14–15.

Alice and Michael Kimble had one son, David Kimble, born in 1985.  Stip. ¶ 8.  Alice Kimble told David Kimble about the UBS account when he was a teenager and instructed him to

---

[1] The facts recited herein were derived from: the June 27, 2018 Stipulation Of Facts ("Stip."); Exhibits attached to the June 27, 2018 Motion For Summary Judgment ("Def. Ex. 1–37); the deposition transcripts of Alice Kimble ("Alice Kimble Tr."), Michael Kimble ("Michael Kimble Tr."), and Steven Weinstein ("Weinstein Tr."); documents attached to the Declaration of Melissa Irons ("Irons Decl. 006–604"); and Exhibits attached to Plaintiffs' July 24, 2018 Cross-Motion For Summary Judgment ("Pl. Ex. A–B").

keep it "totally secret[,] because one day we [may] need to escape the United States."  Alice Kimble Tr. 23:7–8, 116:19.

In or around 1998, Alice and Michael Kimble opened a bank account at HSBC ("HSBC account") in Paris, France to pay expenses associated with a Paris apartment they owned.  Stip. ¶¶ 32, 35.  Michael Kimble made the initial deposit opening the HSBC account.  Stip. ¶ 33.  No money in the HSBC account was derived from illegal activities or used for illegal purposes.  Stip. ¶ 34.

On July 22, 1998, Alice Kimble signed a "Numbered Account Agreement" that directed UBS physically to retain all correspondence about the UBS account at the bank in Switzerland and paid a fee for that service.  Stip. ¶ 23.  That same day, Alice Kimble also signed a "Basic Trust Agreement" that instructed UBS "to effect capital investments in the form of time deposits."  Stip. ¶ 22.[2]

During his marriage to Alice Kimble, Michael Kimble handled the couple's finances and prepared their joint federal tax returns, but never reported any investment income derived either from the HSBC or UBS accounts.  Michael Kimble Tr. 61:24, 62:22–63:1.  Nor did Michael Kimble and Alice Kimble report the existence of their foreign bank accounts on their joint federal tax returns.  Michael Kimble Tr. 63:2–8.  According to Michael Kimble, he did not know about the federal requirement to report foreign bank accounts until he learned about it in the "[l]ate '90s," while using Turbo Tax.  Michael Kimble Tr. 65:12–17.

In 2000, Alice and Michael Kimble divorced.  Stip. ¶ 7.  Alice Kimble did not disclose the UBS account in any of the documents produced during the divorce.  Stip. ¶ 17.  However, after the divorce, Alice Kimble became the sole owner of the HSBC account.  Stip. ¶ 36.  Michael Kimble continued to provide Alice Kimble with financial advice and attended meetings with UBS representatives.  Stip. ¶¶ 18, 29.[3]  According to Alice Kimble, she and Michael Kimble continued to keep the UBS account secret out of respect for Harold Green.  Alice Kimble Tr. 98:15.

In or around 2000, Alice Kimble hired Steven Weinstein, a certified public accountant licensed in New York, to prepare her federal and New York state income tax returns.  Stip. ¶ 41.  Mr. Weinstein never asked Alice Kimble if she had a foreign bank account.  Weinstein 15:15.  At that time, Alice Kimble did not disclose the existence of either the UBS or HSBC accounts to Steven Weinstein.  Stip. ¶ 43.  Alice Kimble also never asked Steven Weinstein whether foreign investment income needed to be reported on her federal income tax returns.  Stip. ¶¶ 44, 45.

In 2005, Alice Kimble granted David Kimble and Frances Green a general Power of Attorney over the UBS account.  Stip. ¶ 19.  The Power of Attorney provided that David Kimble

[2] The Parties' Stipulation Of Facts states that "June 22, 2018," was the date that Alice Kimble signed the Numbered Account Agreement and Basic Trust Agreement.  Stip. ¶¶ 22, 23.  Those documents, however, were dated "22.07.98."  Defs. Ex. 1, 2.

[3] Between 1998 and 2008, Alice and Michael Kimble met with UBS representatives in New York at least six times to discuss the account.  Stip. ¶¶ 28, 29.  Alice Kimble also met with a UBS representative in Switzerland at least once.  Stip. ¶ 28.

and Frances Green "are authorized to act severally and by their sole signature." Def. Ex. 6.  Alice Kimble testified that she gave Michael Kimble a "certain type" of Power of Attorney over the UBS account in 2005, but Michael Kimble's name does not appear on any authorization document and Michael Kimble testified that he was not aware that he was granted a Power of Attorney. *Compare* Alice Kimble Tr. 96:2–6 *with* Def. Ex. 6; Michael Kimble Tr. 44:2.

On April 15, 2005, Alice Kimble signed three documents concerning the USB account. Def. Exs. 3, 4, 5.  The first document was a "Basic Document for Account/Custody Account Relationship," that provided: "Except for special circumstances, correspondence is . . . to be retained for a fee and held available at UBS."  Def. Ex. 5.  The second document was a "Supplement for New Account US Status Tax Form US Withholding Tax/Natural Person Assets and Income Subject to United States Withholding Tax Declaration of Non-US Status."  Stip. ¶ 25. Question 2 of this document provided: "The undersigned account holder hereby declares that he/she is the beneficial owner of the assets and income to which this declaration relates in accordance with [United States] tax law."  Def. Ex. 3.  The third document was a "Verification of the beneficial owner's identity" and provided: "The contracting partner hereby declares" and then listed two options.  Def. Ex. 4.  Alice Kimble checked the box next to the option indicating that "the contracting partner is the sole beneficial owner of the assets concerned."  Def. Ex. 4.  Frances Green was a co-owner of the UBS account at that time; therefore, Alice Kimble's representation to UBS that she was the sole beneficial owner was not accurate.  Alice Kimble Tr. 49:2–3.

Prior to 2008, Alice Kimble did not make any deposits into or withdrawals from the UBS account.  Stip. ¶ 30.  The UBS account earned investment income each year from 2003 through 2008.  Stip. ¶ 49.  In or around 2008, Alice Kimble added David Kimble as a co-owner on the UBS account.  Alice Kimble Tr. 17:19–22.  Thereafter, David Kimble continued to attend meetings between Alice Kimble and UBS representatives.  Alice Kimble Tr. 28:22.

In 2008, Alice Kimble also learned from an article in the *New York Times* that the United States was "putting pressure on UBS to reveal the names of people who had secret accounts in UBS."  Alice Kimble Tr. 55:7–18.  Prior to reading the *New York Times* article, Alice Kimble did not know that she had an obligation to disclose her foreign bank accounts.  Alice Kimble Tr. 87:3; 100:20–101:8.  Around that time, Alice Kimble retained counsel to comply with foreign reporting requirements.  Alice Kimble Tr. 56:20–22.

On June 30, 2008, the balance in the UBS account was $1,365,661.65.  Stip. ¶ 31.  On June 30, 2008, the balance in the HSBC account was $134,129.67.  Stip. ¶ 40.

In 2009, UBS entered a deferred prosecution agreement with the United States that required UBS to provide the IRS with the names and account information of United States citizen clients. Def. Ex. 31 at 161.  On October 24, 2009, Alice Kimble signed a document authorizing UBS to comply with the IRS's request.  Def. Ex. 32 at 199.

In or around 2010, Alice Kimble sold the Paris apartment, closed the HSBC account, and deposited the proceeds into the UBS account.  Stip. ¶ 38; Alice Kimble Tr. 59:1–6.

**B.      Alice Kimble's Federal Tax Returns.[4]**

Alice Kimble timely filed Form 1040s for tax years 2004 through 2008.  Stip. ¶ 47; Def. Ex. 10–14.[5]  But, on those Form 1040s, Alice Kimble did not report any investment income, either from the UBS or HSBC accounts.  Stip. ¶ 50; Def. Exs. 10–14.  Alice Kimble also did not review the accuracy of any federal income tax returns filed on her behalf for tax years 2003 through 2008.  Stip. ¶ 46.

Question 7(a) of IRS Federal Form 1040, U.S. Individual Income Tax Return, Schedule B – Interest and Ordinary Dividends, Part III, Foreign Accounts and Trusts, for the tax years 2004 through 2007 asked: "At any time during [that tax year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?"  Def. Ex. 13 at 82.

In each tax year 2003 through 2008, the IRS also published instructions to Schedule B. *See, e.g.*, Def. Ex. 27.  For example, the 2007 instructions for completing Schedule B stated that a taxpayer should reply "Yes" to Question 7(a) if either:

> 1. You own more than 50% of the stock in any corporation that owns one or more foreign bank accounts.
>
> 2. At any time during 2007 you had an interest in or signature authority over a financial account in a foreign country (such as a bank account, securities account, or other financial accounts).

Def. Ex. 27 at 137.

The 2007 instructions also provided:

> See [the Report of Foreign Bank and Financial Accounts ("FBAR")] to find out if you are considered to have an interest in or signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account). You can get [a FBAR] by visiting the IRS website at www.irs.gov/pub/irs-pdf/f90221.pdf.

---

[4] All relevant statutes and regulations are produced in the Court Appendix, attached to this Memorandum Opinion And Final Order.

[5] Alice Kimble timely filed Form 1040s for tax years 2003 through 2008.  Stip. ¶ 47.  The only Form 1040s, attached as an Exhibit to the June 27, 2018 Motion For Summary Judgment, were for tax years 2004 through 2008.  Def. Ex. 10–14.  Therefore, the court did not rely on the parties' representations regarding Alice Kimble's Form 1040 for tax year 2003 in resolving the pending motions.  *See* RCFC 56(a) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record.").

> If you checked the "Yes" box on line 7a, file [a FBAR] by June 30, 2008, with the Department of the Treasury at the address shown on that form.  Do not attach it to Form 1040.

Def. Ex. 27 at 137.

On each Form 1040 for tax years 2004 through 2007, Alice Kimble checked the box next to Question 7(a) labeled "No."  Stip. ¶ 48; *see, e.g.*, Def. Ex. 13 at 82.  On the Form 1040 for 2008, Alice Kimble left the spaces next to Question 7(a) blank.  Def. Ex. 14 at 88.

Alice Kimble did not timely file a FBAR for calendar years 2003 through 2008.  Stip. ¶ 61. In July 2000, the IRS issued specific FBAR instructions, that stated:

> **Who Must File this Report**  Each United States person, who has a financial interest in or signature authority, or other authority over any financial accounts, including bank, securities, or other types of financial accounts in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing [a FBAR] with the Department of the Treasury on or before June 30, of the succeeding year.

Def. Ex. 28 at 140 (bold in original).

The FBAR instructions define a "financial interest" as:

> **Financial Interest**  A financial interest in a bank, securities, or other financial account in a foreign country means an interest described in either of the following two paragraphs:
>
> (1) A United States person has a financial interest in each account for which such person is the owner of record or has legal title, whether the account is maintained for his or her own benefit or for the benefit of others including non-United States persons.

Def. Ex. 28 at 140 (bold in original).[6]

On April 8, 2009, Alice Kimble applied to the Offshore Voluntary Disclosure Program ("OVDP"), a "voluntary disclosure program specifically designed for taxpayers with exposure to potential criminal liability and/or substantial civil penalties due to a willful failure to report foreign financial assets and pay all tax due in respect of those assets."  Def. Ex. at 33.

---

[6] The instructions for completing the FBAR were again revised in October 2008; those instructions materially are identical to the July 2000 instructions.  *Compare* Def. Ex. 28 *with* Def. Ex. 29.

On October 16, 2009, Alice Kimble was accepted into the OVDP. Stip. ¶ 64; Irons Decl. 351. Around that time, however, Alice Kimble "switched" the UBS account number to a new one, to reflect that David Kimble was no longer a co-owner on the UBS account. Alice Kimble Tr. 37:1–24.

On January 27, 2011, Alice Kimble filed Form 1040X, Amended U.S. Individual Income Tax Return, for tax years 2003 through 2008, as part of her participation in the OVDP. Stip. ¶ 51; Def. Ex. 15–20.

- On the amended return for tax year 2003, Alice Kimble reported an underpayment of $14,564. Stip. ¶ 52; Def. Ex. 15 at 92.

- On the amended return for tax year 2004, Alice Kimble reported an underpayment of $9,473. Stip. ¶ 53; Def. Ex. 16 at 97.

- On the amended return for tax year 2005, Alice Kimble reported an underpayment of $11,165. Stip. ¶ 54; Def. Ex. 17 at 101.

- On the amended return for tax year 2006, Alice Kimble reported an underpayment of $25,643. Stip. ¶ 55; Def. Ex. 18 at 105.

- On the amended return for tax year 2007, Alice Kimble reported an underpayment of $26,391. Stip. ¶ 56; Def. Ex. 19 at 111. Alice Kimble also changed her answer to Question 7(a) on Schedule B – Interest and Ordinary Dividends from "No" to "Yes." Stip. ¶ 60; Def. Ex. at 111.

- On the amended return for tax year 2008, Alice Kimble reported an underpayment of $12,130. Stip. ¶ 57; Def. Ex. 20 at 118.

Each of these underpayments were caused by Alice Kimble's failure to report foreign income to the IRS. Stip. ¶ 58.

On the amended returns for tax years 2003 to 2006 and 2008, Alice Kimble also did not amend her answer to Question 7(a), although income from both the UBS and HSBC accounts was included on amended Schedule B for each of those years. Stip. ¶ 59. Alice Kimble proffered no explanation as to why her answer to Question 7(a) for those years was never amended. Alice Kimble Tr. 82:15.

On September 25, 2012, Alice Kimble filed a FBAR for calendar years 2003 through 2008. Stip. ¶ 62; Def. Ex. 21–26. On each FBAR, Alice Kimble reported the existence of the UBS or HSBC accounts. Stip. ¶ 63; Def. Ex. 21–26.

On October 5, 2012, Alice Kimble and the IRS negotiated a Closing Agreement[7] that required an amendment to her income tax returns 2003 through 2008 to report undisclosed foreign

---

[7] Section 7121 of the Internal Revenue Code provides that:

income and pay the tax liability due. Def. Ex. 34 at 202. In addition, the October 5, 2012 Closing Agreement required Alice Kimble to pay a miscellaneous penalty of $377,309.00. Def. Ex. 34 at 202 ¶ 3. But, Alice Kimble did not know whether the Closing Agreement, bearing her signature, was ever submitted to the IRS. Alice Kimble Tr. 107:10.

In or around February 2013, Alice Kimble attempted to withdraw from the OVDP and declined to pay the miscellaneous penalty. Irons Decl. 334, 336. A letter from Alice Kimble's attorney to the IRS, relaying her decision to withdraw from the OVDP, is dated "January 23, 2013," but a follow-up letter dated "February 26, 2013" clarified that her decision was effective on the later date. Irons Decl. 334, 336. Alice Kimble testified that she decided to "take her chances" with the IRS. Stip. ¶ 66; Alice Kimble Tr. 103:10–11 ("The penalty was so high that I was advised to appeal the penalty."). Thereafter, the IRS sent Alice Kimble a letter informing her that any opt-out from the OVDP would be irrevocable and might cause her to incur a higher penalty. Stip. ¶ 65.

### C.    The Internal Revenue Service Examination.

Sometime in 2013, the IRS began an examination of Alice Kimble's FBAR filings for the 2007 calendar year. Stip. ¶ 67. After an IRS Revenue Agent conducted an audit of the UBS and HSBC accounts, it was determined that Alice Kimble's failure to file a FBAR for 2007 was "willful." Irons Decl. 025–037. Specifically, the IRS found: Alice Kimble was "required to file [FBARs] annually for many years but failed to do so;" she qualified for mitigation, because she satisfied the four regulatory criteria;[8] but her failure to file FBARs nevertheless was "willful." Irons Decl. 025–033. The "willfulness" finding was based on eight factual findings:

1. Alice Kimble had "direct financial interest in the accounts as she was listed as the sole owner of each account." Irons Decl. 030.

---

(a) The Secretary is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period.

26 U.S.C. § 7121.

[8] The four regulatory criteria were:

- No prior history of past FBAR penalty assessments.
- No money in the foreign accounts was from illegal sources or used for criminal purposes, based on available information.
- [Alice Kimble] is cooperating with the [IRS].
- The civil fraud penalty was not asserted for any underpayments of tax that were connected to her failure to file FBARs.

Irons Decl. 025; *see also* I.R.M. § 4.26.16.4.6.1. Unless otherwise noted, all citations to Internal Revenue Manual ("I.R.M.") §§ 4.26.16 *et seq.* reference the I.R.M., issued on July 1, 2008.

2. "All original Schedule B's-Part III [Question 7(a)] per returns were checked 'No.'" Irons Decl. 031. "It is reasonable to assume that a person inheriting a Swiss bank account worth over a million dollars would inform themselves of their obligations related to such an account." Irons Decl. 031.

3. Alice Kimble "failed not only to disclose her accounts and [sic] but also omitted all income associated with them, repeatedly. This went on for decades, and [Alice] Kimble only choose [sic] to correct her returns and participate in [OVDP] after advisement from UBS, once the [July 8, 2008] John Doe [S]ummons was issued to the bank." Irons Decl. 031.

4. Alice Kimble "took efforts to conceal the existence of her accounts." Irons Decl. 031.

5. Alice Kimble "had active management of both accounts." Irons Decl. 032.

6. Alice Kimble "has no business or family connection to either France, or Switzerland." Irons Decl. 032. Fear of persecution "does not represent reasonable cause for noncompliance with U.S. law." Irons Decl. 032.

7. "Even after entering into and opting out of [OVDP] the [sic] [Alice] Kimble has remained non-compliant." Irons Decl. 032.

8. Alice Kimble "had significant involvement with her accounts[,] and has generated sizable offshore income that she chose to conceal (52% of her overall earnings in 2007 were related to concealed foreign accounts)." Irons Decl. 033.

The IRS also rejected Alice Kimble's request to apply a "reasonable cause" standard,[9] because her violation was "willful" and "the facts do not support that ordinary business care and prudence were exercised." Irons Decl. 034. Therefore, the IRS calculated the applicable penalty, in accordance with I.R.M. § 4.26.16.3.6[10] and I.R.M. Exhibit 4.26.16-2.[11] Irons Decl. 035. Next, the IRS added 50 percent of the balance in the UBS account, as of June 30, 2008 ($682,832), to

---

[9] Title 31, U.S.C. § 5321(a)(5)(B)(ii) states that, for non-willful violations, "[n]o penalty shall be imposed" if:

> (I) such violation was due to reasonable cause, and

> (II) the amount of the transaction or the balance in the account at the time of the transaction was properly reported.

31 U.S.C. § 5321(a)(5)(B)(ii).

[10] *See* Court Appendix, *infra*, for the text of I.R.M. § 4.26.16.3.6.

[11] *See* Court Appendix, *infra*, for the text of I.R.M. Exhibit 4.26.16-2.

10 percent of the balance in the HSBC account, as of December 31, 2007 ($14,397).  Irons Decl. 037, 092.[12]  The total penalty amount was determined to be $697,229.  Irons Decl. 037.

On April 7, 2014, the IRS issued Letter 3709, advising Alice Kimble that she owed a penalty of $697,229, pursuant to 31 U.S.C. § 5321(a)(5),[13] for the willful failure to file a FBAR for 2007.  Stip. ¶ 68; Iron Decl. 013–015.

On July 15, 2016, the IRS assessed a penalty in the amount of $697,229.  Stip. ¶ 69.  On or about August 3, 2016, Alice Kimble paid the full amount of the assessed penalty.  Stip. ¶ 70.[14] On September 8, 2016, Alice Kimble filed a Claim For Refund And Request For Abatement with the IRS.  Compl. Ex. A.[15]

## II.    PROCEDURAL HISTORY.

On March 24, 2017, Alice Kimble ("Plaintiff") filed a Complaint in the United States Court of Federal Claims for a refund of the assessed penalty.  ECF No. 1.[16]

On May 16, 2017, the Government filed an Unopposed Motion For An Enlargement Of Time to answer the March 24, 2017 Complaint.  ECF No. 5.  On May 30, 2017, the court granted that Motion.

On July 24, 2017, the Government filed a Second Unopposed Motion For An Enlargement Of Time to answer the March 24, 2017 Complaint.  ECF No. 6.  On July 26, 2017, the Government filed a Motion For Leave To File Answer Out Of Time.  ECF No. 7.  On July 28, 2017, the court granted both the July 24, 2017 and July 26, 2017 Motions.  On July 31, 2017, the Government filed an Answer.  ECF No. 8.

---

[12] The fractional balance for each account was rounded to the nearest dollar, before adding them together.  Irons Decl. 037.

[13] *See* Court Appendix, *infra*, for the text of 31 U.S.C. § 5321(a)(5) (2004).

[14] The Parties' Stipulation states that Alice Kimble paid the assessed penalty on August 3, 2016.  Stip. ¶ 70.

[15] *See* RCFC 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[16] The March 24, 2017 Complaint alleged that Alice Kimble paid the assessed penalty on August 8, 2016.  Compl. ¶ 8.  But, the September 8, 2016 Claim For Refund states that Alice Kimble paid the assessed penalty on "8/11/2016."  Compl. Ex. A.  The March 24, 2017 Complaint also alleged that Alice Kimble's parents were "Holocaust survivors."  Compl. ¶ 16.  But, Alice Kimble testified that both her parents were born in the United States.  Alice Kimble Tr. 92:19–24.  These discrepancies should have been addressed by an amendment to the March 24, 2017 Complaint.  *See* RCFC 11(b).

On September 19, 2017, the parties filed a Joint Preliminary Status Report.  ECF No. 9.

On November 9, 2017, the court issued a Scheduling Order setting a May 18, 2018 deadline for the close of fact discovery and May 29, 2018 as the trial date.  ECF No. 13.

On December 7, 2017, Plaintiff filed a Status Report requesting the court's assistance in "narrowing down, and perhaps resolving, the issues in this case."  ECF No. 14 at 1.

On January 8, 2018, the Government filed a Motion For Order Compelling Production Of Documents.  ECF No. 15.  On January 10, 2018, the parties filed a Joint Status Report requesting that the court vacate the May 29, 2018 trial date.  ECF No. 16.  On January 11, 2018, the court granted the January 8, 2018 Motion To Compel.  ECF No. 17.

On March 12, 2018, the parties submitted a Joint Status Report.  ECF No. 18.  On March 20, 2018, Plaintiff filed a letter requesting that the court convene a discovery conference.  ECF No. 22.  On March 27, 2018, the Government filed an Unopposed Motion For An Enlargement Of Time to respond to the March 20, 2018 letter.  ECF No. 23.  On April 2, 2018, the court granted the March 27, 2018 Motion.  ECF No. 24.

On April 2, 2018, Plaintiff filed a Motion To Withdraw the March 20, 2018 letter.  ECF No. 25.  That same day, the court granted the Motion To Withdraw.  On April 6, 2018, the parties filed a Joint Status Report again requesting that the court vacate the May 29, 2018 trial date.  ECF No. 26.  On April 10, 2018, the court issued a Scheduling Order canceling the May 29, 2018 trial date and setting deadlines for briefing on a motion for summary judgment.  ECF No. 27.

On June 27, 2018, the parties filed a Stipulation Of Facts.  ECF No. 28.  That same day, the Government filed a Motion For Summary Judgment ("Gov't Mot.").  ECF No. 29.

On July 24, 2018, Plaintiff filed a Response And Cross-Motion For Summary Judgment ("Pl. Resp.").  ECF No. 30.  That same day, Plaintiff filed a letter urging the court to consider a case Plaintiff had omitted from its Response And Cross-Motion.  ECF No. 31.

On August 16, 2018, the Government filed an Unopposed Motion For An Enlargement Of Time And Motion For Leave To Exceed Page Limit.  ECF No. 32.  That same day, the court granted the August 16, 2018 Motion.  ECF No. 33.  On August 24, 2018, the Government filed a Response And Reply In Support Of Summary Judgment ("Gov't Reply").  ECF No. 34.  On August 30, 2018, Plaintiff filed an Unopposed Motion For An Enlargement Of Time to file a Reply.  ECF No. 35.  That same day, the court granted the August 30, 2018 Motion.  ECF No. 36.

On October 4, 2018, Plaintiff filed a Reply In Support Of The Cross-Motion For Summary Judgment ("Pl. Reply").  ECF No. 37.

On November 8, 2018, the Government filed a Notice Of Recent Decision to inform the court about the decision of the United States District Court for the Middle District of Florida in *United States v. Estate of Schoenfeld*, No. 3:16-CV-1248-J-34PDB, 2018 WL 4599743 (M.D. Fla. Sept. 25, 2018).  ECF No. 38.

## III.    DISCUSSION.

### A.    Subject Matter Jurisdiction.

Subject matter jurisdiction is a threshold issue that a court must determine at the outset of a case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

The Tucker Act authorizes the United States Court of Federal Claims with jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

The United States Court of Appeals for the Federal Circuit has held that the United States Court of Federal Claims does not have jurisdiction to adjudicate claims that arise under the Due Process Clause of the Fifth Amendment to the United States Constitution. *See, e.g.*, *Wheeler v. United States*, 11 F.3d 156, 159 (Fed. Cir. 1993). But, in *Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005), our appellate court recognized that the United States Court of Federal Claims has jurisdiction to adjudicate an illegal exaction, as it "involves a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment to the Constitution." *Id.* at 1095. "The classic illegal exaction claim is a tax refund suit alleging that taxes have been improperly collected or withheld by the government." *Id.* at 1095. Therefore, to invoke the Tucker Act, a plaintiff must demonstrate that a "statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." *Id.* (quotations omitted). In subsequent cases, the United States Court of Appeals for the Federal Circuit has clarified that "jurisdiction over illegal exaction claims is subject to the administrative refund scheme that Congress established in the Internal Revenue Code," *i.e.*, filing an administrative claim for refund, and complying with applicable statutory time limits. *See Strategic Hous. Fin. Corp. of Travis Cty. v. United States*, 608 F.3d 1317, 1324 (Fed. Cir. 2010) (citing *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 4 (2008)); *see also Taha v. United States*, No. 2018-1879, 2018 WL 6600221, at *3 (Fed. Cir. Dec. 14, 2018) (summarizing the administrative refund scheme).

Although the March 24, 2017 Complaint does not invoke jurisdiction under the Due Process Clause, it does allege that Plaintiff did not commit a willful violation of 31 U.S.C. § 5314, and, even if Plaintiff did commit a willful violation, the IRS assessed an unlawful penalty in excess of $10,000. Stip. ¶ 69. Therefore, if Plaintiff can establish that her violation of 31 U.S.C. § 5314 was not willful, the IRS's penalty assessment *ipso facto* is contrary to law and the court has jurisdiction to order the return of those funds. *See* 28 U.S.C. § 1346(a);[17] *see also Jarnagin v. United States*, 134 Fed. Cl. 368, 375 (Fed. Cl. 2017) (determining that the United States Court of

---

[17] *See* Court Appendix, *infra*, for the text of 28 U.S.C. § 1346(a). Section 1346 complements, but does not displace, the Tucker Act. *See Hinck v. United States*, 64 Fed. Cl. 71, 76 (Fed Cl. 2005), *aff'd*, 446 F.3d 1307 (Fed. Cir. 2006), *aff'd*, 550 U.S. 501 (2007).

Federal Claims has subject matter jurisdiction to adjudicate a violation of 31 U.S.C. § 5321(a)(5) (2004)).[18]

The September 8, 2016 Claim For Refund[19] is sufficient to satisfy Congress's administrative refund scheme.   *See* 26 U.S.C. § 7422(a) ("No suit or proceeding shall be maintained . . . until a claim for refund or credit has been duly filed[.]"); *see also* 26 U.S.C. § 6511(a) (establishing time limits for refund claims).[20]

For these reasons, the court has determined that it has subject matter jurisdiction to adjudicate the claim alleged in the March 24, 2017 Complaint.

### B.    Standing.

The United States Court of Federal Claims, although an Article I court, "applies the same standing requirements enforced by other federal courts created under Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).   Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017).   To demonstrate the existence of a case or controversy, a plaintiff must show "an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

The IRS assessed a $697,229 penalty against Plaintiff.   Stip. ¶ 69.   Plaintiff paid that penalty in full.   Compl. ¶ 8.   That is sufficient to establish an injury in fact.   *See Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2462 (2018) (holding that an employee had standing to challenge agency fees automatically deducted from his wages). Plaintiff's monetary injury was "fairly traceable" to the IRS's penalty assessment.   *See Spokeo*, 136 S. Ct. at 1547.   And, if the court orders the IRS to refund the penalty, that will redress Plaintiff's alleged monetary injury.   *Id.*

---

[18] In *Jarnagin*, Plaintiffs did not appeal the decision of the United States Court of Federal Claims and the time to file a Notice of Appeal has passed.

[19] The September 8, 2016 Claim For Refund was attached as an Exhibit to the March 24, 2017 Complaint.   The court may consider that Exhibit in ruling on the June 27, 2018 Motion For Summary Judgment.   *See* RCFC 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[20] *See* Court Appendix, *infra*, for the text of 26 U.S.C. § 6511(a).   Plaintiff filed the September 8, 2016 Claim For Refund approximately one month after she paid the IRS the full amount of the assessed penalty, well within the 2-year and 3-year time limits set by 26 U.S.C. § 6511(a).   *Compare* Compl. Ex. A *with* Stip. ¶ 70.   Therefore, the court does not need to determine whether Section 6511 applies to an administrative claim requesting refund of a FBAR penalty assessed, pursuant to 31 U.S.C. § 5321(a)(5).

For these reasons, the court has determined that Plaintiff has standing to seek an adjudication of the claims alleged in the March 24, 2017 Complaint.

## C.     Standard Of Review.

Rule 56 of the United States Court of Federal Claims ("RCFC") authorizes a party to file a motion for summary judgment, that a court should grant "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56. "A genuine dispute exists when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *8x8, Inc. v. United States*, 854 F.3d 1376, 1380 (Fed. Cir. 2017) (citations omitted). "A material fact is one that might affect the outcome of the case." *Id.* (citations omitted). "The party seeking summary judgment has the initial burden of establishing that there is no genuine dispute as to any material fact." *Id.* In addition, the court must "draw all factual inferences in favor of the nonmovant." *Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1361 (Fed. Cir. 2016).

## D.     Whether Plaintiff Willfully Failed To File A Foreign Bank Account Report.

The parties stipulated that Plaintiff failed to file a FBAR for 2007. Stip. ¶ 48. In addition, Plaintiff admitted that she is "not disput[ing] the FBAR penalty for the HSBC account." Def. Ex. 30 at 154. Plaintiff also admitted that she "is not seeking recovery of the 2007 FBAR penalty imposed for the HSBC account." Def. Ex. 30 at 154. As such, the court does not need to determine whether the penalty assessed by the IRS against the HSBC account was lawful. *See* RCFC 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."). Therefore, the threshold issue the court must determine is whether Plaintiff's failure to file a FBAR for the 2007 tax year was "willful."

### 1.     The Government's Motion For Summary Judgment.

The Government argues that summary judgment is appropriate to resolve "willfulness," because Plaintiff "(1) knew that she had funds in a Swiss bank account and in a French bank account; and (2) did not report her interest in the accounts on a timely FBAR, but despite that knowledge, falsely represented on her income-tax return that she had no foreign bank accounts." Gov't Mot. at 2. In addition, Plaintiff: "manag[ed] her foreign accounts with the help of her UBS bankers;" "did not maintain the account in her own name;" "hid the account from the United States by not investing in U.S. securities;" and "failed to tell her accountant that she had a foreign bank account." Gov't Mot. at 2–3.

Then-applicable IRS regulations required Plaintiff to file a FBAR for 2007, on or before June 30, 2008. Gov't Mot. 17. Plaintiff failed to file a FBAR on that date, either for the UBS or HSBC accounts. Gov't Mot. 17. A violation of 31 U.S.C. § 5321(a)(5) (2004) is "willful[]" where a taxpayer: (1) violates the law "voluntarily rather than accidentally;" (2) is "willfully blind" to the legal duty to report; or (3) engages in conduct that is in "reckless disregard" of the legal duty to report. Gov't Mot. at 18. Plaintiff's conduct was willful under each of these standards. Gov't Mot. at 18.

First, Plaintiff's failure to report was voluntary, because she signed her 2007 federal tax return knowing of the obligation to report. Gov't Mot. 19–23. Plaintiff had actual knowledge of

the filing requirement, but decided not to inform the IRS about the UBS account.  Gov't Mot. at 21.  In addition, Plaintiff maintained a numbered account and instructed UBS not to send any account-related correspondence to the United States.  Gov't Mot. at 22.  And, Plaintiff did not inform her accountant about the existence of her foreign bank accounts.  Gov't Mot. at 22.

Second, as a matter of law, a taxpayer is charged with knowledge of the representations made on federal tax returns.  Gov't Mot. at 19 (citing *Jarnagin*, 134 Fed. Cl. at 378).  Plaintiff also had knowledge of the FBAR requirement posited by Question 7(a) on Form 1040 of her 2007 income tax return.  Gov't Mot. at 20.  In addition, Plaintiff was "willfully blind" to the requirement that she file a FBAR.  Gov't Mot. at 23–25.  To be "willfully blind," "a [person] must subjectively believe that there is a high probability that a fact exists and the [person] must take deliberate actions to avoid learning that fact."  *United States v. McBride*, 908 F. Supp. 2d 1186, 1210 (D. Utah 2012) (modifications in original).  Plaintiff admitted that she never read her tax returns or any of the documents she signed related to the UBS account.  Stip. ¶ 46.  Therefore, Plaintiff was "willfully blind" of her duty to comply with IRS reporting requirements.  Gov't Mot. at 24.

In sum, Plaintiff engaged in reckless disregard of the statutory duty to: file a FBAR; answer Question 7(a) accurately on her 2007 income tax return; and ask her accountant for advice on any reporting requirements or other federal tax issues that might arise in connection with the UBS account.  Gov't Mot. at 25–28.  Therefore, Plaintiff's conduct was "willful."  Gov't Mot. at 8.

## 2.      Plaintiff's Response And Cross-Motion For Summary Judgment.

Plaintiff responds that "willfulness" is a "voluntary, intentional violation of a known legal duty."  Pl. Resp. at 12.  The Government's interpretation of 31 U.S.C. § 5321 would render the term "willful" superfluous, because every taxpayer who fails to file a FBAR does so willfully.  Pl. Resp. at 13.  In this case, Plaintiff never read her tax returns and had no knowledge of the FBAR or other federal tax reporting requirements.  Pl. Resp. at 17.  "[C]onduct properly characterized as willful must meet a higher standard than a simple failure to check the box on the tax return showing the existence of a foreign account, pay taxes on the income[,] and file a FBAR."  Pl. Resp. at 14.  In addition, each case cited by the Government "involved conduct significantly more egregious than that evidenced here."  Pl. Resp. at 15.

I.R.M. § 4.26.16.6.5.1, Willful FBAR Violations–Evidence (Nov. 6, 2015) defines "willfulness" as "knowledge of the reporting requirements and [a] conscious choice not to comply."  Pl. Resp. at 18.  Plaintiff was not aware that she had a legal duty to report her foreign bank accounts to the IRS until 2008.  Pl. Resp. at 13–14.  She made no conscious choice not to comply.  Pl. Resp. at 14.  In addition, I.R.M. § 4.26.16.6.5.2, Willful FBAR Violations–Defining Willfulness (Nov. 6, 2015) provides a list of documents that the IRS references to determine whether a failure to comply with reporting requirements is "willful;" none of those documents, however, were proffered by the Government in this case.  Pl. Resp. at 19–20.  Congress created a higher penalty for willful violations to punish "bad actors."  Pl. Resp. at 20.  Plaintiff is not a bad actor; she did not use the UBS account for any illegal activities.  Pl. Resp. at 20.

## 3.      The Government's Reply And Response To Plaintiff's Cross-Motion.

The Government replies that Plaintiff's definition of "willfulness" concerns criminal activity; a less exacting standard applies to activity that is civil in nature.  Gov't Reply at 3.  A

number of courts have determined that a willful failure to file a FBAR evidences recklessness and willful blindness. Gov't Reply at 4 (citing *United States v. Williams*, 489 F. App'x 655, 658 (4th Cir. 2012) (holding that "willful blindness" in certain circumstances "may be inferred")). Moreover, Plaintiff's failure to report the UBS account on her federal income tax returns was part of a broader effort to conceal the account's existence from the IRS. Gov't Reply at 5. Plaintiff designated the UBS account as a numbered account, elected not to receive account-related correspondence in the United States, and instructed her son that the account was to remain secret. Gov't Reply at 5. It does not make any difference if Plaintiff did not read her tax returns; as a matter of law, a taxpayer is charged with constructive knowledge of the contents of a signed income tax return. Gov't Reply at 7. Likewise, the fact that others have committed more egregious FBAR violations does not shield Plaintiff from liability. Gov't Reply at 8–9.

### 4.      Plaintiff's Reply.

Plaintiff reiterates that the Government's position would render most FBAR violations as willful, contrary to Congress's intent in establishing a multi-tiered system of penalties. Pl. Reply at 3–5. More importantly, when the IRS assessed a penalty against Plaintiff, it did not proffer any evidence that she knew about the reporting requirement prior to 2008. Pl. Reply at 6.

### 5.      The Court's Resolution.

On October 22, 2004, Congress authorized the Secretary of the Treasury to impose a "civil money penalty" for a violation of 31 U.S.C. § 5314, with a heightened penalty reserved for "willful[]" violations. *See* 31 U.S.C. § 5321(a)(5)(C)(i) (2004). The United States Supreme Court has held that, since "willfulness is a statutory condition of civil liability," it is "generally taken[] to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (holding that a "willful" violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681n, includes reckless conduct). Therein, the United States Supreme Court defined "recklessness" as "violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68 (internal quotations omitted); *see also Godfrey v. United States*, 748 F.2d 1568, 1577 (Fed. Cir. 1984) (holding in the context of federal tax law that "willful conduct" includes "a reckless disregard of an obvious and known risk that taxes might not be remitted") (citations and quotation marks omitted).

On November 6, 2015, the IRS issued I.R.M. §§ 4.26.16.6.5.1 and 4.26.16.6.5.2. I.R.M. § 4.26.16.6.5.1 defined "willfulness" as "knowledge of the reporting requirements and [a] conscious choice not to comply."[21] I.R.M. § 4.26.16.6.5.2 identified thirteen documents that "may be helpful" to the IRS in "establishing willfulness."[22] Plaintiff argues that any violation of 31 U.S.C. § 5314 was not "willful," because the Government did not proffer any of the documents listed in I.R.M. § 4.26.16.6.5.2 in this case. Pl. Resp. at 19–20. There are two problems with Plaintiff's argument. First, I.R.M. § 4.26.16.6.5.2 does not state that the existence of one of the listed documents is a prerequisite to establishing a willful FBAR violation. Second, the

---

[21] *See* Court Appendix, *infra*, for the text of I.R.M. § 4.26.16.6.5.1.

[22] *See* Court Appendix, *infra*, for the text of I.R.M. § 4.26.16.6.5.2.

Government did proffer several of the listed documents, *i.e.*, bank statements from the UBS account and the IRS examiner's work product.  *See* I.R.M. § 4.26.16.6.5.2(2)(a), (m) (Nov. 6, 2015).

The relevant stipulated facts in this case are as follows:

- Plaintiff did not disclose the existence of the UBS account to her accountant until approximately 2010.  Stip. ¶ 43.
- Plaintiff never asked her accountant how to properly report foreign investment income.  Stip. ¶ 44.
- Plaintiff did not review her individual income tax returns for accuracy for tax years 2003 through 2008.  Stip. ¶ 46.
- Plaintiff answered "No" to Question 7(a) on her 2007 income tax return, falsely representing under penalty of perjury, that she had no foreign bank accounts.  Stip. ¶ 48.

In the court's judgment, stipulations ¶¶ 46 and 48 together evidence conduct by Plaintiff, as a co-owner of the UBS account that exhibited a "reckless disregard" of the legal duty under federal tax law to report foreign bank accounts to the IRS by filing a FBAR.  *See Godfrey*, 748 F.2d at 1577; *see also Norman v. United States*, 138 Fed. Cl. 189, 194 (Fed. Cl. 2018) (determining that a taxpayer was "put on inquiry notice of the FBAR requirement when she signed her tax return") (internal quotations omitted), *appeal docketed*, No. 18-2408 (Fed. Cir. Sept. 18, 2018); *see also Jarnagin*, 134 Fed. Cl. at 378 ("A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents.") (citations omitted).[23]  Although Plaintiff had no legal duty to disclose information to her accountant or to ask her accountant about IRS reporting requirements, these additional undisputed facts do not affect the court's determination that Plaintiff's conduct in this case was "willful."

For these reasons, the court has determined, viewing the evidence in the light most favorable to Plaintiff, that there is no genuine issue of material fact that Plaintiff violated 31 U.S.C. § 5314 and that her conduct was "willful."  *See* 31 U.S.C. § 5321(a)(5) (2004); *see also* RCFC 56.

---

[23] A May 23, 2018 Memorandum the IRS Office of Chief Counsel distributed to IRS program managers states that, "[t]he standard for willfulness under 31 U.S.C. § 5321(a)(5)(C) is the civil willfulness standard, and includes not only knowing violations of the FBAR requirements, but willful blindness to the FBAR requirements as well as reckless violations of the FBAR requirements."  *Burden of Proof and Standard for Willfulness Under 31 U.S.C. § 5321(a)(5)(C)*, PMTA-2018-13, at 1 (May 23, 2018).  For a comprehensive discussion of how other federal courts have construed whether a FBAR violation is "willful," *see* Hale E. Sheppard, "*What Constitutes A 'Willful' FBAR Violation?*," 129 J. TAX'N 24 (Nov. 2018) (collecting cases).

**E.    Whether The Internal Revenue Service Abused Its Discretion In Assessing Plaintiff A Civil Penalty Of $697,229.**

**1.    The Government's Motion For Summary Judgment.**

The Government argues that Congress amended 31 U.S.C. § 5321(a)(5) in 2004 to increase the maximum penalty for FBAR violations, and thereby superseded 31 C.F.R. § 1010.820(g)(2). Gov't Mot. at 34. Thereafter, if the IRS determined a willful violation of 31 U.S.C. § 5321(a)(5) (2004) occurred, the IRS had authority to impose a civil penalty "up to the greater of $100,000 or 50% of the balance in the account at the time of the violation." Gov't Mot. at 28.

In this case, the IRS considered I.R.M. Exhibit 4.26.16–2, Normal FBAR Penalty Mitigation Guidelines For Violations Occurring After October 22, 2004, in calculating the penalty to be assessed to Plaintiff regarding the UBS and HSBC accounts. Under those Guidelines, the IRS properly exercised discretion in finding that Plaintiff's HSBC account should be treated as a Mitigation Level of II; but Plaintiff's UBS account should be treated as a Mitigation Level of IV. Gov't Mot. at 30. The penalties that the IRS assessed were "within the range authorized by Congress." Gov't Mot. at 33.[24]

**2.    Plaintiff's Response And Cross-Motion For Summary Judgment.**

Plaintiff responds that the IRS abused its discretion when it assessed a penalty for the 2007 FBAR violation, because it did not consider factors other than the size of the account, in determining the penalty. Pl. Resp. at 22. The IRS also abused its discretion when it found that Plaintiff was the "sole beneficiary" of the UBS account after her father's death, since she was a co-owner with her mother. Pl. Resp. at 23. In addition, the IRS abused its discretion when it found that Plaintiff did not have any personal connection to Switzerland, when she did have a connection by "inherit[ing] an account domiciled there." Pl. Resp. at 23. And, the IRS abused its discretion when it found that Plaintiff "actively managed" the UBS account. Pl. Resp. at 23. In fact, Plaintiff resisted her husband's urgings to invest the funds in the UBS account more aggressively and followed her father's instructions that the account be used only in an emergency. Pl. Resp. at 23–24.

The IRS's assessment of the maximum penalty against Plaintiff also was an abuse of discretion, because the IRS did not adhere to regulations that set the maximum penalty of $100,000, but were not changed after Congress amended 31 U.S.C. § 5321(a)(5) in 2004. Pl. Resp. at 28. And, the penalty assessed was an "excessive fine," in violation of the Eighth Amendment to the United States Constitution. Pl. Resp. at 26–27.

---

[24] In that regard, the Government suggests that the non-precedential decision of the United States District Court for the Western District of Texas in *United States v. Colliot*, No. 16-1281, 2018 WL 2271381 (W.D. Tex. May 16, 2018), determining that 31 C.F.R. § 1010.820(g)(2) continues to cap FBAR penalties at $100,000 is erroneous and should not be followed. Gov't Mot. at 35–37.

### 3.      The Government's Reply And Response To Plaintiff's Cross-Motion.

The Government replies that the IRS properly utilized I.R.M. § 4.26.16.3.6 in evaluating Plaintiff's FBAR violation and determined that she satisfied the requirements for a mitigated penalty. Gov't Reply at 10. But, the IRS declined to mitigate the maximum statutory penalty assessed in 2016, with respect to the UBS account, because of the eight factual determinations made by the IRS examiner. Gov't Reply at 10–11. In addition, Plaintiff did "not explain how the IRS's allegedly erroneous findings would affect the outcome of the decision-making process." Gov't Reply at 11. For example, the fact that Plaintiff was added as a co-owner of the UBS account does not establish a personal connection with Switzerland. Gov't Reply at 12. Plaintiff was involved in management of the UBS account, as evidenced by meetings she attended with representatives from the bank annually to review investments. Gov't Reply at 13. In addition, Plaintiff's April 15, 2005 "Verification of the beneficial owner's identity" evidences that she was the sole beneficiary of the UBS account. Def. Ex. 4.

The IRS penalty assessment also did not violate the Eighth Amendment to the United States Constitution, because the penalty was not a "fine," nor was it "excessive." Gov't Reply 15–28. The IRS applied the maximum penalty established by Congress at 31 U.S.C. § 5321(a)(5)(C)(i) (2004). Gov't Reply at 29. As a matter of law, when Congress increased the maximum penalty above $100,000 on October 22, 2004, 31 C.F.R. § 1010.820(g)(2) no longer had any effect. Gov't Reply 30–34.

### 4.      Plaintiff's Reply.

Plaintiff replies that the IRS's penalty assessment violated the Eighth Amendment to the United States Constitution, because it was a disproportionate fine that was punitive in nature. Pl. Reply at 8–11. When Congress increased the maximum penalty that could be assessed for FBAR violations, it did not mandate that a penalty, greater than $100,000, be assessed in any individual case. Pl. Reply at 13. The IRS is bound by the agency's regulations and the IRS's decision not to remove the pre-2004 regulations from the Code of Federal Regulations was not unintentional; Plaintiff is entitled to rely on those regulations. Pl. Reply at 14–15.

### 5.      The Court's Resolution.

On July 15, 2016, the IRS assessed a maximum penalty against Plaintiff with respect to the UBS account, pursuant to 31 U.S.C. § 5321(a)(5)(C)(i) (2004), and properly referenced I.R.M. § 4.26.16.3.6 in doing so. Irons Decl. 035. Plaintiff does not identify why that assessment violated any statute or applicable regulation. *See generally* Compl.; Pl. Resp.; Pl. Reply. Instead, Plaintiff argues that the IRS's decision was an abuse of discretion, because: (1) Plaintiff was not the "sole beneficiary" of the UBS account; (2) Plaintiff did have a personal connection to Switzerland; (3) Plaintiff did not "actively manage" the UBS account; and (4) the IRS did not rely on the documents listed in I.R.M. § 4.26.16.6.5.2 that evidence willfulness. Pl. Resp. at 23–24. Therefore, Plaintiff reasons that she is entitled to rely on the $100,000 maximum penalty set forth in 31 U.S.C. §5321(a)(5) (2003). Pl. Resp. at 23–24.

As to the ownership of the UBS account, although the record evidences that Plaintiff was not the "sole beneficiary" of the UBS account, Plaintiff represented that she was the sole beneficiary in an April 15, 2005 "Verification of the beneficial owner's identity." Def. Ex. 4.

19

Assuming *arguendo* that the IRS erroneously determined Plaintiff was the sole beneficiary, Plaintiff nevertheless failed to establish why being only a co-owner necessarily rendered the IRS's penalty assessment unlawful or an abuse of discretion.   *Compare* Pl. Resp. at 23 *with* Irons Decl. at 030.

As to the IRS's finding that Plaintiff did not have a personal connection to Switzerland, as a matter of law, only having a property interest in a bank account is not sufficient to establish a "significant contact with a foreign country."  *See* 26 C.F.R. § 301.7701(b)-2(d)(1).[25]

As to Plaintiff's role in managing the UBS account, the parties stipulated that between 1998 and 2008, Alice Kimble met with representatives of UBS in New York at least six times and met with a UBS representative in Switzerland at least once.  Stip. ¶¶ 28, 29.   Therefore, the IRS did not abuse its discretion in finding that Plaintiff actively was involved with the UBS account. Irons Decl. at 032.   As to the documents listed in I.R.M. § 4.26.16.6.5.2, the court previously addressed this issue at D.5, *supra*.

Plaintiff is also no longer entitled to be assessed a maximum civil penalty of $100,000, as set forth in 31 U.S.C. § 5321(a)(5) (2003).[26]  On October 22, 2004, Congress enacted a new statute that increased the statutory maximum penalty for a "willful" violation to "the greater of [] $100,000, or [] 50 percent of the . . . balance in the account at the time of the violation."  *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418, 1586, § 821 (Oct. 22, 2004) ("Jobs Creation Act").   And, on July 1, 2008, the IRS issued I.R.M. § 4.26.16.4.5.1, that stated: "At the time of this writing, the regulations at [31 C.F.R. § 1010.820] have not been revised to reflect the change in the willfulness penalty ceiling."  I.R.M. § 4.26.16.4.5.1.  The IRS, however, warned that, "the statute [*i.e.*, the Jobs Creation Act] is self-executing and the new penalty ceilings apply."  I.R.M. § 4.26.16.4.5.1.  Although, the Jobs Creation Act is inconsistent with 31 C.F.R. § 1010.820(g)(2), it is settled law that an agency's regulations "must be consistent with the statute under which they are promulgated."  *United States v. Larionoff*, 431 U.S. 864, 873 (1977).  Since the civil penalty amount for a "willful" violation in 31 U.S.C. § 5321(a)(5) (2003) was replaced with 31 U.S.C. § 5321(a)(5)(C)(i) (2004), the April 8, 1987 regulations are "no longer valid." *Norman*, 138 Fed. Cl. at 196.

The court's research has found two recent United States District Court cases determining that, although the IRS theoretically may assess a penalty greater than $100,000 for a FBAR violation committed after 2004, the IRS is still bound by the maximum penalty in the pre-2004 statute.  *See Colliot*, 2018 WL 2271381, at *3;[27] *United States v. Wahdan*, 325 F. Supp. 3d 1136,

---

[25] *See* Court Appendix, *infra*, for the text of 26 C.F.R. § 301.7701(b)-2(d)(1).

[26] *See* Court Appendix, *infra*, for the text of 31 U.S.C. § 5321(a)(5) (2003).

[27] In *Colliot*, the United States District Court for the Western District of Texas determined that 31 C.F.R. § 1010.820(g)(2) survived the enactment of the Jobs Creation Act, because "[r]ules issued via notice-and-comment rulemaking must be repealed via notice-and-comment rulemaking."  2018 WL 2271381, at *3 (citing *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1205 (2015)).  In *Perez*, the United States Supreme Court held that agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." 135 S. Ct. at 1206.  The Jobs Creation Act, however, is not an agency rule and Congress has

1141 (D. Colo. 2018).[28]  The reasoning of these cases, however, conflicts with the decision of the United States Court of Appeals for the Federal Circuit in *Barseback Kraft AB v. United States*, 121 F.3d 1475 (Fed. Cir. 1997).  In that case, nuclear energy companies sued to enforce contracts for uranium with the United States Department of Energy ("DOE").  *Id.* at 1477.  The contracts provided that prices would be set in accordance with "DOE pricing policy for such services."  *Id.* at 1478.  After the parties executed the contracts, Congress enacted legislation that transferred responsibility for administering uranium sales to a new federal agency, and "changed the government's pricing strategy from one based on recovering just its costs to one aimed at profit maximization."  *Id.*  The uranium companies argued that the new agency was bound by DOE's pricing regulations, but the United States Court of Appeals for the Federal Circuit held that the "DOE could not have had any valid uranium enrichment pricing policy in 1993 and 1994[,] because Congress had stripped it of its authority to sell uranium enrichment services."  *Id.* at 1480.  "The fact that DOE's [pricing regulations] *had not been formally withdrawn* from the Code of Federal Regulations [did] not save them from invalidity."  *Id.* (emphasis added).  Like the legislation that stripped DOE of authority over uranium pricing, the Jobs Creation Act replaced the prior penalty for willful violations of federal tax law in 31 U.S.C. § 5321(a)(5) (2003), thereby nullifying any inconsistent regulations governing the pre-2004 statute.

For these reasons, the court has determined, viewing the evidence in the light most favorable to Plaintiff, that there is no genuine issue of material fact as to whether the IRS abused its discretion, when it assessed a civil penalty against Plaintiff of $697,229, *i.e.*, 50 percent of the balance in the UBS account in 2007.  *See* 31 U.S.C. § 5321(a)(5)(C)(i) (2004); *see also* RCFC 56.[29]

---

authority prospectively to alter the effect of agency regulations.  *See Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 438–40 (1992) (holding that a statutory amendment affecting ongoing litigation over forest management did not violate Article III of the United States Constitution, because it "compelled changes in law, not findings or results under old law").

[28] In *Wahdan*, the United States District Court for the District of Colorado determined that the Secretary of the Treasury adjusted the maximum FBAR penalty for inflation several times in the past decade.  *See* 325 F. Supp. 3d at 1140.  According to that court, "[t]his suggests that the Secretary was aware of the penalties available under 31 U.S.C. § 5321(a)(5)(C) and elected to continue to limit the IRS'[s] authority to impose penalties to $100,000."  *Id.*  Although this inference is plausible, it is more likely that the Secretary of the Treasury determined that I.R.M. § 4.26.16.4.5.1 correctly determined that the Jobs Creation Act was "self-executing."  Regardless, any legitimate inference that may be drawn from a series of routine inflation adjustments after 2004 does not alter the text of the Jobs Creation Act.

Neither of the aforementioned United States District Court decisions explain why the Jobs Creation Act should be construed to retain the $100,000 maximum penalty set forth at 31 C.F.R. § 1010.820(g)(2), but supersede the remainder of the regulation.

[29] The court does not need to address Plaintiff's argument that the penalty assessment violated the Eighth Amendment to the United States Constitution, because the March 24, 2017 Complaint did not allege such a claim.  *See Casa de Cambio Comdiv S.A., de C.V. v. United States*,

## IV.     CONCLUSION.

For the reasons discussed herein, the June 27, 2018 Motion For Summary Judgment is granted; the July 24, 2018 Cross-Motion For Summary Judgment is denied.  The Clerk of Court is directed to enter judgment for the Government.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Senior Judge**

---

291 F.3d 1356, 1366 (Fed. Cir. 2002) ("No mention of this theory appears in [Plaintiff's] complaint.  Under the circumstances, we hold that [Plaintiff] waived any claim it may have against the government based on such a theory.").  In any event, the only other court that considered this issue determined that the FBAR penalty was not punitive.  *See Estate of Schoenfeld*, 2018 WL 4599743, at *11 (determining that the FBAR penalty is "remedial," not "penal").

**COURT APPENDIX**

**A.      Relevant Statutes.**

**26 U.S.C. § 6511(a)** provides:

> Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid.  Claim for credit or refund of an overpayment of any tax imposed by this title which is required to be paid by means of a stamp shall be filed by the taxpayer within 3 years from the time the tax was paid.

26 U.S.C. § 6511(a).

**31 U.S.C. § 5314** provides:

> (a)  Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency. The records and reports shall contain the following information in the way and to the extent the Secretary prescribes:
>
> > (1)   the identity and address of participants in a transaction or relationship.
> >
> > (2)   the legal capacity in which a participant is acting.
> >
> > (3)   the identity of real parties in interest.
> >
> > (4)   a description of the transaction.
>
> (b)  The Secretary may prescribe—
>
> > (1)    a reasonable classification of persons subject to or exempt from a requirement under this section or a regulation under this section;
> >
> > (2)   a foreign country to which a requirement or a regulation under this section applies if the Secretary decides applying the requirement or regulation to all foreign countries is unnecessary or undesirable;

(3)   the magnitude of transactions subject to a requirement or a regulation under this section;

(4)    the kind of transaction subject to or exempt from a requirement or a regulation under this section; and

(5)   other matters the Secretary considers necessary to carry out this section or a regulation under this section.

(c)   A person shall be required to disclose a record required to be kept under this section or under a regulation under this section only as required by law.

31 U.S.C. § 5314.

**31 U.S.C. § 5321(a)(5)** provides:

(A) Penalty authorized.—

The Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314.

(B)   Amount of penalty.—

(i) In general.—

Except as provided in subparagraph (C), the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000.

(ii) Reasonable cause exception.—No penalty shall be imposed under subparagraph (A) with respect to any violation if—

(I)   such violation was due to reasonable cause, and

(II)   the amount of the transaction or the balance in the account at the time of the transaction was properly reported.

(C)   Willful violations.—In the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314—

(i)   the maximum penalty under subparagraph (B)(i) shall be increased to the greater of—

(I)   $100,000, or

(II) 50 percent of the amount determined under subparagraph (D), and

(ii)  subparagraph (B)(ii) shall not apply.

31 U.S.C. § 5321(a)(5) (2004).

**31 U.S.C. § 5321(a)(5) (2003)** provided:

Foreign financial agency transaction violation.—

(A) Penalty authorized.—The Secretary of the Treasury may impose a civil money penalty on any person who willfully violates or any person willfully causing any violation of any provision of section 5314.

(B) Maximum amount limitation.—The amount of any civil money penalty imposed under subparagraph (A) shall not exceed—

(i) in the case of violation of such section involving a transaction, the greater of—

(I) the amount (not to exceed $100,000) of the transaction; or

(II) $25,000; and

(ii) in the case of violation of such section involving a failure to report the existence of an account or any identifying information required to be provided with respect to such account, the greater of—

(I) an amount (not to exceed $100,000) equal to the balance in the account at the time of the violation; or

(II) $25,000.

31 U.S.C. § 5321(a)(5) (2003).

**28 U.S.C. § 1346(a)** provides:

The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected

without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

28 U.S.C. § 1346(a).

**B.      Relevant Internal Revenue Service Regulations.**

**26 C.F.R. § 301.7701(b)-2(d)(1)** provides that:

> In general. For purposes of section 7701(b) and the regulations under that section, an alien individual will be considered to have a closer connection to a foreign country than the United States if the individual or the Commissioner establishes that the individual has maintained more significant contacts with the foreign country than with the United States. In determining whether an individual has maintained more significant contacts with a foreign country than the United States, the facts and circumstances to be considered include, but are not limited to, the following -

> (i) The location of the individual's permanent home;

> (ii) The location of the individual's family;

> (iii) The location of personal belongings, such as automobiles, furniture, clothing and jewelry owned by the individual and his or her family;

> (iv) The location of social, political, cultural or religious organizations with which the individual has a current relationship;

> (v) The location where the individual conducts his or her routine personal banking activities;

> (vi) The location where the individual conducts business activities (other than those that constitute the individual's tax home);

> (vii) The location of the jurisdiction in which the individual holds a driver's license;

> (viii) The location of the jurisdiction in which the individual votes;

> (ix) The country of residence designated by the individual on forms and documents; and

(x) The types of official forms and documents filed by the individual, such as Form 1078 (Certificate of Alien Claiming Residence in the United States), Form W-8 (Certificate of Foreign Status) or Form W-9 (Payer's Request for Taxpayer Identification Number).

26 C.F.R. § 301.7701(b)-2(d)(1).

**31 C.F.R. § 1010.820** provides:

(a) For any willful violation, committed on or before October 12, 1984, of any reporting requirement for financial institutions under this chapter or of any recordkeeping requirements of §§ 1010.311, 1010.313, 1020.315, 1021.311 or 1021.313, the Secretary may assess upon any domestic financial institution, and upon any partner, director, officer, or employee thereof who willfully participates in the violation, a civil penalty not to exceed $1,000.

(b) For any willful violation committed after October 12, 1984 and before October 28, 1986, of any reporting requirement for financial institutions under this chapter or of the recordkeeping requirements of § 1010.420, the Secretary may assess upon any domestic financial institution, and upon any partner, director, officer, or employee thereof who willfully participates in the violation, a civil penalty not to exceed $10,000.

(c) For any willful violation of any recordkeeping requirement for financial institutions, except violations of § 1010.420, under this chapter, the Secretary may assess upon any domestic financial institution, and upon any partner, director, officer, or employee thereof who willfully participates in the violation, a civil penalty not to exceed $1,000.

(d) For any failure to file a report required under § 1010.340 or for filing such a report containing any material omission or misstatement, the Secretary may assess a civil penalty up to the amount of the currency or monetary instruments transported, mailed or shipped, less any amount forfeited under § 1010.830.

(e) For any willful violation of § 1010.314 committed after January 26, 1987, the Secretary may assess upon any person a civil penalty not to exceed the amount of coins and currency involved in the transaction with respect to which such penalty is imposed. The amount of any civil penalty assessed under this paragraph shall be reduced by the amount of any forfeiture to the United States in connection with the transaction for which the penalty was imposed.

(f) For any willful violation committed after October 27, 1986, of any reporting requirement for financial institutions under this chapter (except § 1010.350, § 1010.360 or § 1010.420), the Secretary may assess upon any domestic financial institution, and upon any partner, director, officer, or employee thereof who willfully participates in the violation, a civil penalty not to exceed the greater of the amount (not to exceed $100,000) involved in the transaction or $25,000.

(g) For any willful violation committed after October 27, 1986, of any requirement of § 1010.350, § 1010.360 or § 1010.420, the Secretary may assess upon any person, a civil penalty:

> (1) In the case of a violation of § 1010.360 involving a transaction, a civil penalty not to exceed the greater of the amount (not to exceed $100,000) of the transaction, or $25,000; and

> (2) In the case of a violation of § 1010.350 or § 1010.420 involving a failure to report the existence of an account or any identifying information required to be provided with respect to such account, a civil penalty not to exceed the greater of the amount (not to exceed $100,000) equal to the balance in the account at the time of the violation, or $25,000.

(h) For each negligent violation of any requirement of this chapter, committed after October 27, 1986, the Secretary may assess upon any financial institution a civil penalty not to exceed $500.

(i) For penalties that are assessed after August 1, 2016, see § 1010.821 for rules relating to the maximum amount of the penalty.

31 C.F.R. § 1010.820.

C.      **Internal Revenue Service Manual.**

**I.R.M. § 4.26.16.3.6** provided:

(1) The FBAR is required for each calendar year during which the aggregate amount(s) in the account(s) exceeded $10,000 valued in U.S. dollars at any time during the calendar year.  The maximum value of an account is the largest amount of currency and non-monetary assets that appear on any quarterly or more frequent account statement issued for the applicable year.  For example, if the statement closing balance is $9,000 but at any time during the year a balance of $15,000 appears on a statement, the maximum value is $15,000.

(2) If periodic account statements are not issued, the maximum account asset value is the largest amount of currency and non-monetary assets in the account at any time during the year.

(3) Convert foreign currency by using the official exchange rate in effect at the end of the year in question for converting the foreign currency into U.S. dollars.  In valuing currency of a country that uses multiple exchange rates, use the rate that would apply if the currency in the account were converted into U.S. dollars at the close of the calendar year.  The official Treasury Reporting Rates of Exchange for the previous quarter year can be obtained at http://fms.treas.gov/intn.html#rates or by calling the Department of the Treasury, Financial Management Service [("FMS")] International Funds Team at (202) 874-7994.  As these rates are published quarterly, the rates should be accessed during the first quarter of the following year to obtain the previous December 31 valuation.  The rates posted on the FMS website are the current exchange rates.   Historical exchange rates will be needed to determine the value in a foreign account in prior years.   For historical exchange rates, call FMS at (202) 874-8001 or (202) 874-8004.  These phone numbers may be subject to change.  Check the FMS website (http://www.fms.treas.gov) for the most current information.

(4) The value of stock, other securities, or other non-monetary assets in an account reported on the FBAR is the fair market value at the end of the calendar year, or if withdrawn from the account earlier in the year, at the time of the withdrawal.

(5) If the filer had a financial interest in more than one account, each account is valued separately in accordance with the previous paragraphs.

(6) If a person had a financial interest in one or more but fewer than 25 accounts and is unable to determine whether the maximum value of these accounts exceeded $10,000 at any time during the year, the FBAR instructions state that the person is to complete Part II of the FBAR and if needed, the continuation page(s) for each of these accounts.  If the maximum aggregate value of the accounts was not in excess of $10,000, then there would be no FBAR violation if the person did not file the FBAR, whether or not the person knew the value of the accounts at the time the FBAR was due.  This is because section 103.27(c) of the Title 31 regulations only requires FBARs to be filed when the value of the accounts exceeds $10,000 during a calendar year.  For rules regarding a person with a financial interest in 25 or more accounts, *see* I.R.M. § 4.26.16.3.9.

I.R.M. § 4.26.16.3.6 (July 1, 2008).

**I.R.M. § 4.26.16.6.5.1** provides:

(1) The test for willfulness is whether there was a voluntary, intentional violation of a known legal duty.

(2) A finding of willfulness under the BSA must be supported by evidence of willfulness.

(3) The burden of establishing willfulness is on the Service.

(4) Willfulness is shown by the person's knowledge of the reporting requirements and the person's conscious choice not to comply with the requirements. In the FBAR situation, the person only need know that a reporting requirement exists. If a person has that knowledge, the only intent needed to constitute a willful violation of the requirement is a conscious choice not to file the FBAR.

(5) Under the concept of "willful blindness," willfulness is attributed to a person who made a conscious effort to avoid learning about the FBAR reporting and recordkeeping requirements.

EXAMPLE:

Willful blindness may be present when a person admits knowledge of, and fails to answer questions concerning, his interest in or signature or other authority over financial accounts at foreign banks on Schedule B of his Federal income tax return. This section of the income tax return refers taxpayers to the instructions for Schedule B, which provides guidance on their responsibilities for reporting foreign bank accounts and discusses the duty to file the FBAR. These resources indicate that the person could have learned of the filing and recordkeeping requirements quite easily. It is reasonable to assume that a person who has foreign bank accounts should read

the information specified by the government in tax forms. The failure to act on this information and learn of the further reporting requirement, as suggested on Schedule B, may provide evidence of willful blindness on the part of the person.

Note: The failure to learn of the filing requirements coupled with other factors, such as the efforts taken to conceal the existence of the accounts and the amounts involved, may lead to a conclusion that the violation was due to willful blindness. The mere fact that a person checked the wrong box, or no box, on a Schedule B is not sufficient, in itself, to establish that the FBAR violation was attributable to willful blindness.

(6) The following examples illustrate situations in which willfulness may be present:

> (a.) A person files the FBAR, but omits one of three foreign bank accounts. The person had previously closed the omitted account at the time of filing the FBAR. The person explains that the omission was due to unintentional oversight. During the examination, the person provides all information requested with respect to the omitted account. The information provided does not disclose anything suspicious about the account, and the person reported all income associated with the account on his tax return. The penalty for a willful violation should not apply absent other evidence that may indicate willfulness.

> (b.) A person filed the FBAR in earlier years but failed to file the FBAR in subsequent years when required to do so. When asked, the person does not provide a reasonable explanation for failing to file the FBAR. In addition, the person may have failed to report income associated with foreign bank accounts for the years that FBARs were not filed. A determination that the violation was willful would likely be appropriate in this case.

> (c.) A person received a warning letter informing him of the FBAR filing requirement, but the person continues to fail to file the FBAR in subsequent years. When asked, the person does not provide a reasonable explanation for failing to file the FBAR. In addition, the person may have failed to report income associated with the foreign bank accounts. A determination that the violation was willful would likely be appropriate in this case.

I.R.M. § 4.26.16.6.5.1 (Nov. 6, 2015).

**I.R.M. § 4.26.16.6.5.2** provides:

(1) Willfulness can rarely be proven by direct evidence, since it is a state of mind. It is usually established by drawing a reasonable inference from the available facts. The government may base a determination of willfulness on inference from conduct meant to conceal sources of income or other financial information. For FBAR purposes, this could include concealing signature authority, interests in various transactions, and interests in entities transferring cash to foreign banks.

(2) Documents that may be helpful in establishing willfulness include:

(a.) Copies of statements for the foreign bank account.

(b.) Notes of the examiner's interview with the foreign account holder/taxpayer about the foreign account.

(c.) Correspondence with the account holder's tax return preparer that may address the FBAR filing requirement.

(d.) Documents showing criminal activity related to the non-filing of the FBAR (or non-compliance with other BSA provisions).

(e.) Promotional material (from a promoter or offshore bank).

(f.) Statements for debit or credit cards from the offshore bank that, for example, reveal the account holder used funds from the offshore account to cover everyday living expenses in a manner that conceals the source of the funds.

(g.) Copies of any FBARs filed previously by the account holder (or FinCEN Query printouts of FBARs).

(h.) Copies of Information Document Requests with requested items that were not provided highlighted along with explanations as to why the requested information was not provided.

(i.) Copies of debit or credit card agreements and fee schedules with the foreign bank, which may show a significantly higher cost than typically associated with cards from domestic banks.

(j.) Copies of any investment management or broker's agreement and fee schedules with the foreign bank, which may show significantly higher costs than costs associated with domestic investment management firms or brokers.

(k.) The written explanation of why the FBAR was not filed, if such a statement is provided. Otherwise, note in the workpapers whether there was an opportunity to provide such a statement.

(l.) Copies of any previous warning letters issued or certifications of prior FBAR penalty assessments.

(m.) An explanation, in the workpapers, as to why the examiner believes the failure to file the FBAR was willful.

(3) Documents available in an FBAR case worked under a Related Statute Determination under Title 26 that may be helpful in establishing willfulness include:

(a.) Copies of documents from the administrative case file (including the Revenue Agent Report) for the income tax examination that show income related to funds in a foreign bank account was not reported.

(b.) A copy of the signed income tax return with Schedule B attached, showing whether or not the box pertaining to foreign accounts is checked or unchecked.

(c.) Copies of tax returns (or RTVUEs or BRTVUs) for at least three years prior to the opening of the offshore account and for all years after the account was opened, to show if a significant drop in reportable income occurred after the account was opened. (Review of the three years' returns prior to the opening of the account would give the examiner a better idea of what the taxpayer might have typically reported as income prior to opening the foreign account).

(d.) Copies of any prior Revenue Agent Reports that may show a history of noncompliance.

(e.) Two sets of cash T accounts (a reconciliation of the taxpayer's sources and uses of funds) with one set showing any unreported income in foreign accounts that was identified during the examination and the second set excluding the unreported income in foreign accounts.

(f.) Any documents that would support fraud (see IRM 4.10.6.2.2 for a list of items to consider in asserting the fraud penalty).

I.R.M. § 4.26.16.6.5.2 (Nov. 6, 2015).

**I.R.M. Exhibit 4.26.16-2**, Normal FBAR Penalty Mitigation Guidelines For Violations Occurring After October 22, 2004, in part:

| Willfulness Penalties | |
| --- | --- |
| To Qualify for Level I – Determine Aggregate Balances | If the maximum aggregate balance for all accounts to which the violations relate did not exceed $50,000, Level I applies to all accounts.  Determine the maximum balance at any time during the calendar year for each account.  Add the individual maximum balances to find the maximum aggregate balance. |
| Level I Penalty is | The greater of $1,000 per violation or 5% of the maximum balance during the year of the account to which the violations relate for each violation. |
| To Qualify for Level II – Determine Account Balance | If Level I does not apply and if the maximum balance of the account to which the violations relate at any time during the calendar year did not exceed $250,000, Level II applies to that account. |
| Level II Penalty is per account | The greater of $5,000 per violation or 10% of the maximum balance during the calendar year for each Level II account. |
| To Qualify for Level III | If the maximum balance of the account to which the Level III violations relate at any time during the calendar year exceeded $250,000 but did not exceed $1,000,000, Level III applies to that account. |
| Level III Penalty is per account | The greater of (a) or (b): (a) 10% of the maximum balance during the calendar year for each Level III account, or (b) 50% of the closing balance in the account as of the last day for filing the FBAR. |
| To Qualify for Level IV | If the maximum balance of the account to which the violations relate at any time during the calendar year exceeded $1 million, Level IV, the statutory maximum, applies to that account. |
| Level IV Penalty is per account the statutory maximum | The greater of (a) or (b): (a) $100,000, or (b) 50% of the closing balance in the account as of the last day for filing the FBAR. |

I.R.M. Exhibit 4.26.16-2 (July 1, 2008).